2026 IL App (2d) 250146-U
No. 2-25-0146
Order filed June 22, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

RICHARD P. ROWLAND, Defendant-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable Tiffany E. Davis, Judge, Presiding.
No. 24-CF-261

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*: The evidence was sufficient to support defendant's convictions beyond a reasonable doubt. The trial court's challenged evidentiary rulings did not constitute abuses of discretion, and it did not engage in prejudicial *ex parte* communications with the jury.

¶ 2   Following a jury trial, defendant, Richard P. Rowland, was convicted of three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2024)) for which he received consecutive 12-year sentences of imprisonment totaling 36 years. Defendant appeals, arguing that the testimony of the victim, K.T., was so fraught with inconsistency, factually suspect, and otherwise incredible as to be insufficient to support his convictions. Defendant also argues

the trial court abused its discretion when it precluded him from introducing evidence of "false accusations, when it refused to allow him to subpoena K.T.'s medical records without conducting an *in camera* review, when it allowed the State to present expert testimony concerning child abuse accommodation syndrome, and when it denied his request under the completeness doctrine to include another portion of his recorded statement to police to contextualize the statement introduced by the State. Last, defendant argues that he was prejudiced by the court communicating *ex parte* with the jury regarding scheduling deliberations on Halloween. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant's primary challenge in this appeal is to the sufficiency of the evidence and other evidentiary questions. We therefore recount the evidence adduced at trial. Regarding the other issues, we will include any necessary facts with our analysis of those issues.

¶ 5      At the time of trial, K.T. was 15 years of age and a sophomore in high school. From June 2017 to February 2019, when she was between the ages of 6 and 8, she lived at defendant's residence with her family (her mother, Amy W., her stepfather, Eric W., and her brother, C.T.) and defendant and his wife, Julie Rowland. K.T. and C.T. shared a bedroom on the second floor; her mother and stepfather initially shared a room next to the bathroom on the second floor, and defendant and Julie shared a third room on the second floor. When Amy gave birth to R.W., K.T. and C.T. switched rooms with Amy and Eric and occupied the room next to the bathroom. There was another individual whose name K.T. could not recall who occupied the remaining room on the second floor.

¶ 6      K.T. testified that she did not have a good relationship with defendant because she felt he tried to parent and discipline her even when K.T.'s parents were present. Beginning when she was six or seven, defendant would "punish" K.T. for breaking his rules by sexually assaulting her.

- 2 -

These incidents occurred nearly every day,[1] and it continued until her family moved out of defendant's home.

¶ 7    K.T. described her memory of defendant's first assault. She was using the downstairs bathroom. Defendant entered the bathroom and placed two fingers into K.T.'s vagina. Defendant told K.T. that placing his fingers into her vagina was to punish her for not eating her dinner and throwing it away. Defendant departed, and K.T. dressed and went to her room. Defendant's wife, Amy, and C.T. were all home during the incident. K.T. did not tell anyone because defendant threatened her that, if she told, defendant would kick the entire family out of his house and K.T. did not know where they could live. K.T. understood that her family was living with defendant because of her mother's recent divorce from her biological father, Greg T.

¶ 8    The next incident K.T. described occurred when she was showering in the upstairs bathroom while Amy was preparing dinner for her and C.T. While she was showering, defendant entered the bathroom. Defendant told K.T. that he was punishing her because she had been fighting with her parents that day. Defendant first placed his fingers in K.T.'s vagina and then placed his penis in her vagina, which hurt K.T. K.T. began crying and begging defendant to stop, but he continued, telling her to be quiet because she was being loud. Defendant left the bathroom first and K.T. put on her clothes and went to her room. She did not tell anyone because of defendant's threat to kick her family out of his home.

¶ 9    K.T. described a third incident that happened early on a Saturday morning before sunrise. She went downstairs to watch a cartoon, SpongeBob SquarePants. Amy and C.T. were upstairs,

---

[1]K.T. acknowledged on cross-examination that she told police that the incidents occurred every day.

sleeping; K.T. was unsure if Eric or Julie were home. Defendant entered the living room and told her she needed to be punished because she had been bad the previous night. K.T. was wearing her nightgown and underwear. Defendant sat down on the couch next to K.T. and began rubbing her legs. Defendant moved K.T.'s underwear to the side, placed his fingers in her vagina, and then placed his penis in her vagina. Defendant cautioned K.T. to be quiet because he did not want her to wake anyone else up. K.T. believed that the incident lasted the amount of time it took for two full SpongeBob episodes to play. Defendant left K.T. crying in the living room, but she did not tell anyone because of defendant's previous threats to kick her family out of the home.

¶ 10    According to K.T., defendant was assaulting her nearly every day. She would go to school, go from school to gymnastics, and then return home around dinnertime and take a shower. Defendant typically would assault her in the bathroom after she showered. The result of the assault frequently left K.T. bleeding from her vagina, and she was often bruised around her inner thighs and hips. K.T. usually bled into her underwear, so she would throw out the bloody underwear. She threw out so many pairs of underwear that her mother believed she was leaving the underwear at the gym and had to buy her more. When asked about her gymnastics uniform, K.T. explained that, during practice, she wore a leotard but did not wear underwear with the leotard. The gym required the students to wear leggings or shorts, and she usually wore leggings.

¶ 11    K.T. testified that she last saw defendant in January 2024. In March 2024 she made her initial disclosure to her therapist about defendant's abuse. K.T. explained that she learned that defendant and his wife were babysitting her sister, R.W., and she did not want R.W. to go through what she experienced.

¶ 12    K.T.'s biological father moved to Texas following the divorce.  K.T. visited him at least once during the time she resided with defendant.  K.T. told him that defendant yelled a lot, but she did not tell him about the abuse.

¶ 13    K.T. testified that defendant videotaped some of the assaults, and she acknowledged that she had not initially disclosed the recordings when she first spoke to the police.  Defendant would place an object in the bathroom during an assault, and it had a red light, so K.T. believed it to be a recording device.  K.T. noted that defendant did not seem to leave the object in the bathroom after the assaults.  Defendant would sometimes mention recordings of the assaults to K.T., saying that he would "still be able to watch" the recordings after she and her family had moved out of the house.

¶ 14    K.T. did not like going back to defendant's home to visit and would fight with her parents about it.  K.T. explained that she did not want to return because she was scared defendant would abuse her again and she "didn't want to see his face."

¶ 15    Amy W., K.T.'s mother, testified that, early in 2017, the family moved into defendant's home because, as part of her divorce from Greg T., she needed to sell their previous home.  At that time, Eric was attending school and taking paramedic classes, and they were unable to afford a home of their own.  In addition to her family, an unrelated boarder, Paul, also lived in defendant's home.  Initially, she and Eric occupied the room next to the bathroom, but K.T. and C.T. eventually moved into that room.  Paul's room was across from the bathroom.

¶ 16    According to Amy, K.T. was seven years of age and in the third or fourth grade when they moved into defendant's home.  Amy described K.T. as an average kid, active and fun-loving, and K.T. occupied much of her free time with gymnastics.  On weeknights, K.T. had practices, and on weekends, she had competitions.  On school days, she attended a before-school program and

gymnastic practices after school. The time K.T. returned home in the evening was in part dependent on Eric's schedule, because he picked her up. Amy believed K.T. and Eric had a good relationship even though Eric was not around much due to school. She also thought K.T. and Julie had a good relationship.

¶ 17 Amy characterized K.T.'s relationship with defendant as "[n]ot good," because defendant tried to interject himself as a parent. Amy typically disciplined K.T., but defendant would attempt to discipline K.T. even if Amy were present and able to do so herself. Among the examples Amy gave were times defendant yelled at K.T. for sitting in "his chair," not eating food at dinner, and jumping and bumping down the stairs or in the hallway. The only discipline Amy witnessed defendant give was yelling.

¶ 18 Amy continually bought K.T. new underwear while they were in defendant's house; she had no idea where the old underwear went but believed it had been left behind at gymnastics. Amy did not notice any suspicious bruising on K.T.'s body that concerned her, believing instead that any bruises were due to gymnastics. She also did not hear K.T. crying in the bathroom and did not notice defendant in the bathroom with K.T. at any time.

¶ 19 Eric eventually obtained a new job, and their family could afford a home of their own. After they moved, K.T. made it clear she did not want defendant and Julie to visit. K.T. also resisted visiting defendant at his home, so generally, on weekends, Amy would take only C.T. and R.W. to visit defendant and Julie. After they moved, Amy's relationship with defendant deteriorated because "he was very nasty" to her children during the time they lived at defendant's home. Defendant would reprimand behavior that Amy believed was "[kids] just being kids," and, on occasion, stepped in to talk to defendant about his disciplinary actions.

¶ 20 Amy described that, when K.T. initially revealed defendant's abuse, it caused a rift between her and Eric. They were both taken off-guard, and Amy believed they both needed to be on the same page supporting K.T. through the process.

¶ 21 Eric testified that defendant is his stepfather, making him K.T.'s step-grandfather. Defendant and Julie offered to let Eric's family live in their home because of the issues arising from Amy's divorce from Greg T. Eric believed he had a "fine" relationship with K.T., and they argued no more than any father and daughter, Eric described K.T.'s relationship with defendant as "fine at first," but that relationship steadily deteriorated during the time the family lived with defendant until the family was able to move to their own home. Before the family moved into defendant's home, K.T. had been "a bubbly, excitable, fun, little girl;" after they were living with defendant, K.T. became "far more irritable," "standoffish," no longer listened well, and argued with Eric and Amy "a lot." Nevertheless, K.T. maintained a good relationship with Julie, Eric's mother.

¶ 22 Eric testified that K.T. and defendant argued constantly causing Eric to be dragged into their arguments to mediate. K.T. and defendant's arguments typically revolved around household rules. According to Eric, defendant occasionally interjected himself into ordinary issues, such as the children being too rambunctious, even though he acknowledged that Amy and Eric set the rules for the children and enforced their discipline. On occasion, he and Amy had to ask defendant to stop trying to discipline the children, and defendant would acquiesce and stop. Eric was never concerned that K.T.'s and defendant's arguments would escalate beyond the verbal into the physical.

¶ 23 While the family was in defendant's home, K.T. tried to avoid interacting with defendant. Before moving in with defendant, K.T. had not exhibited behavioral issues either at home or at

school. When the family moved into their own home, K.T.'s demeanor improved, but she remained distant and irritable. K.T.'s distance and irritability persisted until she revealed defendant's abuse to Eric and Amy.

¶ 24 Eric recounted that the initial assignment of the family's bedrooms had him and Amy sleeping in the room next to the upstairs bathroom. From that bedroom, he could hear running water or talking in the bathroom. In fact, he could hear people throughout the house, but could not hear what was said, only a general idea of where they were. Eric did not recall hearing crying, sobbing, or any concerning sounds from the bathroom. He did not recall seeing defendant in the bathroom when K.T. was in it and did not recall observing any sort of video recording device in the bathroom. When Amy became pregnant, they switched their bedroom with K.T.'s and C.T.'s bedroom.

¶ 25 Eric did not directly see K.T.'s bruises but had been told about them. K.T. maintained, and Eric accepted, the bruising was from gymnastics class. Likewise, Eric was not aware that K.T.'s pediatrician ever raised concerns about any examinations of K.T.

¶ 26 Shannon Krueger testified that she was trained as a nurse and employed as a director and medical provider for the University of Illinois College of Medicine MERIT program, which provides expert medical evaluations of children suspected to have been physically or sexually abused or neglected. Krueger handled the interview and examination of K.T. K.T. told Krueger that she had been sexually abused by defendant and, after some of the incidents, had pain and bleeding. Krueger asked K.T. questions about self-harm to which she admitted some episodes, but Krueger determined that K.T. was not currently a threat to herself or anyone else. K.T. also disclosed difficulty falling and staying asleep as well as fear of defendant. Krueger learned that

the last incident with defendant occurred several years before her examination, and she deemed it a matter of "delayed disclosure."

¶ 27    K.T.'s examination was normal. Krueger explained that over 90% of the children seen at the MERIT facility have a normal examination. Krueger opined that the normal examination did not rule out the possibility that K.T. had been sexually abused.

¶ 28    Shelley Pier, a licensed clinical social worker specializing in working with survivors of sexual assault and sexual abuse, provided expert testimony about sexual abuse and the various psychological aspects of sexual abuse survivors. She explained that post-traumatic stress disorder (PTSD) is a precise diagnosis used in the fields of psychiatry and psychology. To make a PTSD diagnosis, the individual must meet certain criteria and exhibit certain symptoms. In distinction, rape trauma syndrome, which is not a diagnosis, is used in Pier's field to systematize and explain the symptoms and behaviors of persons who have experienced sexual violence. Pier explained that rape trauma syndrome is associated with PTSD because it is one of the phases of rape trauma syndrome typically experienced. Next, she touched on child abuse accommodation syndrome (accommodation syndrome), which was another tool used by professionals in her field and which also was not a diagnosis. It, too, was associated with PTSD, and a child experiencing accommodation syndrome would also have been diagnosed with PTSD.

¶ 29    Returning to rape trauma syndrome, Pier explained it consists of four phases. The first phase is the attack itself. The attack causes the body to release certain chemicals which cause the second phase: PTSD-type symptoms. The third phase is called "outward adjustment," in which the person tries to move on and to cope with the PTSD symptoms. The fourth phase is called "resolution" or "integration," in which the survivor is able to manage PTSD symptoms. The symptoms may not go away, but the survivor is able to cope with them and work, attend school,

maintain healthy relationships, and the like. Pier described the experience of the phases of rape trauma syndrome as a circular instead of a linear progression because a survivor may be triggered and re-experience PTSD before progressing again to manage those symptoms.

¶ 30 Pier also discussed a survivor's typical responses to a traumatic event. A person can experience a fight or flight response, in which she will fight back or run away from the trauma. Pier identified two other responses: freeze and fawn. Freeze is the most common response to sexual assault and sexual abuse, and is where the body literally freezes in place; the victim cannot fight back, scream, or do anything to stop the situation. The fawn response is typically associated with child abuse and child sexual assault. Pier described fawning as an attempt to placate the perpetrator to survive the situation, to prevent further abuse, and to keep loved ones safe. More specifically, flight, freeze, and fawn are all typically associated with rape trauma syndrome.

¶ 31 Pier also discussed aspects of accommodation syndrome more thoroughly. Specifically, Pier noted that disclosure of the abuse for child survivors is different than for adults. Half of all child survivors do not disclose the abuse. Additionally, a child's disclosure may be piecemeal or confusing, causing the other adults in their lives to disbelieve the child or to misunderstand what the child is trying to convey. A child survivor often will recant the disclosure because of the discomfort and upheaval caused by the investigation. Further, delayed reporting is common because an abuser typically makes sure, by threats or by normalization of the abuse, that the child will keep the abuse a secret. Moreover, the relationship between the child and abuser is also linked to the likelihood of disclosure, with the chance of disclosure decreasing the closer the relationship between the child and the abuser.

¶ 32 Pier emphasized that the other adults in the home would likely remain unaware of the ongoing abuse. The abuser perpetrates the abuse in secret, isolating the victim, and engaging in

episodes of abuse when others were not around or unlikely to observe. In fact, according to Pier, it is "very, very rare for non-offending caregivers, or people in the home, to know what is going on, unless they walk in on it."

¶ 33    Finally, Pier opined that delayed disclosure has no impact on the veracity of the allegations of abuse. In addition to the reasons given for delaying disclosure of sexual abuse in her testimony about rape trauma syndrome and accommodation syndrome, she noted that even many adults who experience sexual abuse will delay disclosure, and, for children, it could be months or years after the abuse concluded.

¶ 34    Detective Ethan Berillo of the Crystal Lake police department and lead detective in this case testified that, in March 2024, he observed K.T.'s interview at the Child Advocacy Center. Berillo acknowledged that, during the interview, K.T. did not disclose that defendant had recorded any of the assaults; two or three weeks after the interview, however, K.T. disclosed that defendant had recorded his assaults. Berillo obtained and executed a search warrant and seized electronic equipment from defendant's home. The seized items were analyzed, but no child pornography was discovered. Berillo did not know whether any of the seized items had been in defendant's possession while K.T. resided there, and the investigation could not determine whether any information had been deleted from the equipment.

¶ 35    Dr. Marcus DeGraw, a pediatrician specializing in child abuse, provided expert testimony about the physical aspects of child sexual abuse on behalf of defendant. According to DeGraw, most sexual abuse cases result in no physical injury to the victim, and physical examination of the victim provides normal results even if the victim has alleged inappropriate contact or even sexual assault. DeGraw's anecdotal experience mirrored the reporting in scholarly studies that victims will have normal physical examination in 90-95% of cases involving sexual abuse allegations.

¶ 36    DeGraw explained that factors such as a violent assault, repeated contact over time, or significant pain and bleeding after an assault would increase the chances of an abnormal physical examination. Nevertheless, even if all the factors were present, it would still be "quite common" for a victim to have a normal physical examination. DeGraw opined that, in K.T.'s case, because she disclosed that defendant's assaults frequently left her in pain and bleeding, it would be "more likely than an average case that there would be" an abnormal physical examination. Despite his expectation, DeGraw acknowledged that he would not expect an examination occurring five years after the last episode of sexual abuse to reveal any scar tissue. Generally, children's vaginal and genital injuries heal quickly and without visible scar tissue. Moreover, K.T. reported nearly daily bleeding, but it was not a voluminous amount even if K.T. may have believed it to be greater because of its frequency.

¶ 37    Paul Lyon, the boarder who resided in defendant's home during K.T.'s family's tenure, testified that he noticed nothing unusual pertaining to K.T. when she lived there. Specifically, he did not hear anything unusual from either the upstairs or downstairs bathroom, did not observe scratches or bruises on K.T., and did not notice that K.T.'s eyes were bloodshot, as if she had been crying. He additionally testified that defendant had set up the television to require a complicated process to turn it on, requiring four remotes and Lyon had to use the written instructions any time he wished to watch that television.

¶ 38    Donna Nowak, one of K.T.'s coaches for gymnastics, testified that K.T. wore shorts or leggings with her leotard during gymnastics. Nowak was a mandated reporter, required to report suspicions of physical abuse, and she did not observe any suspicious injuries like scratches or bruises on K.T.'s body. Nowak conceded that she had no reason to look at K.T.'s lower back or hips.

¶ 39    Defendant's wife, Julie, testified that she and defendant had been married over 21 years. In a previous marriage, she had Eric, and Eric had married Amy. K.T. was Amy's child from a previous marriage, and R.W. had not yet been born when Eric and Amy married. Eric's family moved in with Julie and defendant to save money until they could find a place of their own. When Eric's family moved into their home, she and defendant had not spent much time with Amy and Amy's children; while they were not strangers, they were new in Julie's and defendant's lives. According to Julie, they tried to treat K.T. and C.T. no differently than any of their other grandchildren.

¶ 40    Julie had an even-keeled relationship with K.T., and she tried to make sure she treated K.T. as she treated her other granddaughter, who was the same age as K.T. Defendant did not engage with K.T. to the same extent that she did. Both she and defendant asked K.T. to modify her behavior, and both asked Amy to back up their request. Julie acknowledged that Amy was in charge of K.T.'s discipline and it was not Julie's place to parent the children. Amy, however, pushed back on their requests. She became closer to Amy and Eric's family after they moved out because they no longer had the daily friction of sharing the same house.

¶ 41    Julie testified that, during the time K.T. lived with them, she did not recall hearing crying or sobbing from either bathroom or any other room in the home. She did not recall observing any bruises or marks on K.T.'s body—the only injuries she recalled were to K.T.'s arm from a gymnastics injury, and to K.T.'s foot from a cheerleading injury. Julie believed that K.T. saw physicians for each of those injuries.

¶ 42    Julie characterized K.T. as always angry, negative, and defiant. Defendant avoided K.T. as much as he could. Defendant and K.T. frequently argued, but she never observed any physical violence between defendant and K.T.

¶ 43     Julie noted that defendant had created a complicated system for using the television and other electronics in the family room on the first floor.  She noted that, to use it, the user had to know what to turn on and which remote to use.  Defendant taught her, Eric, and Amy to use the entertainment system.

¶ 44     Eric's family was welcomed by Julie and defendant to get on their feet and save money for their own home, but after Eric had taken some family trips, Julie and defendant felt they were not wisely managing their finances and needed to move out because, if they had enough money for trips, they had enough money for their own home.  She and defendant discussed this with Eric and Amy, and they agreed to move out.

¶ 45     Defendant testified on his own behalf.  At the time of the trial, defendant was 60 years old.  When Eric's family lived with him, defendant was employed as an IT engineer.  In the spring of 2017, Eric and Amy asked whether they could stay in defendant's home while they saved money to buy a house.  In June 2017, Eric's family moved in.

¶ 46     Before they moved in, defendant and Julie had not had significant interaction with K.T. and C.T.  Defendant found that K.T. was oppositional from the start and refused to listen to anyone making requests of her.  Defendant treated K.T. as he did his other biological grandchildren, but it quickly became clear to him that K.T. was not interested in any grandparent-grandchild relationship.  The conflict between defendant and K.T. caused his relationship with Amy to deteriorate and he began to deal only with Eric.  He would approach Eric for any issue regarding the children, and, whenever he made a request of K.T., she would complain to Amy that defendant had no right to do that, and Amy would berate defendant.  Amy told defendant on multiple occasions not to parent her children.

¶ 47     By contrast, defendant had no problems with K.T.'s brother, C.T.  With K.T., however, defendant started "hiding out" in his basement to attempt to avoid the drama K.T.'s complaints caused.  Defendant found it clear very early into Eric's family's tenure that he needed to stay away from K.T., and he was not going to have a relationship with her like he had with his children and grandchildren.

¶ 48     Defendant denied that he ever physically or sexually abused K.T.  He denied entering the bathroom any time K.T. was in there.  He insisted there was no truth to the allegations that he treated K.T. inappropriately in any way.  Specifically, defendant denied inserting his fingers or penis in K.T.'s vagina, and he denied any attraction either to prepubescent children or to K.T.

¶ 49     Defendant denied any recollection of an incident in the downstairs family room.  He agreed he had created a complex television hookup in the basement, and he did not believe that K.T. or any of the other children would have been able to turn on the television.

¶ 50     Defendant denied that he used the upstairs bathroom and asserted he was never in that bathroom alone with K.T.  On no occasion when upstairs in his home did he hear sobbing from that bathroom, and he did not observe bruising or other signs of abuse on K.T.'s body—he noted, however, that K.T. would get bruises from gymnastics.

¶ 51     According to defendant, K.T. was a defiant child.  Defendant attributed this to the turmoil caused by Amy's divorce from Greg T. and moving in with him, a virtual stranger.  Defendant disagreed that he tried to impose rules on K.T.  Instead, in his view, K.T. would complain to Amy, and Amy would yell at him for requesting that K.T. not do something.

¶ 52     In the spring or summer of 2019, Eric and his family moved out of his home.  According to defendant, he and Julie had discussed Eric's family trips, which made it clear to them that "it

was time for [Eric and his family] to go."  Even after they moved out, K.T. did not care to be around defendant.

¶ 53    On October 31, 2024, the case was submitted to the jury.  About four hours into the jury's deliberations, the trial court called in the parties and asked, "Thoughts on letting [the jury] go home to enjoy Halloween with their family and then come back tomorrow morning?"  The State expressly objected, and defendant stated, "I tend to agree with the State on this one, unless they ask. *** But if they are quietly working, I don't think we should interrupt them at this point." The court revealed it already had the bailiff ask the jury what their family obligations were that evening, and the jury indicated "they would like to go home."  The court concluded it would have the bailiff "tell them to keep deliberating," and the parties agreed.  After this exchange in open court between the court and the parties, the jury returned with a verdict and found defendant guilty of three counts of predatory criminal sexual assault of a child.  Defendant asserts that the amount of time between the court informing the parties about the bailiff's inquiry into the jurors' obligations and the return of the verdict was 20-30 minutes.

¶ 54    On March 20, 2025, the trial court sentenced defendant to three consecutive 12-year terms of imprisonment, for an aggregate term of 36 years.  Defendant timely appeals.

¶ 55                                    II. ANALYSIS

¶ 56    On appeal, defendant's primary issue is a challenge to the sufficiency of the evidence. Defendant also raises evidentiary issues, contending the trial court abused its discretion: denying his request to introduce evidence of K.T.'s purported false accusations against him, admitting testimony about accommodation syndrome, and denying his request to include additional excerpts from his statements to the police under the completeness doctrine.  Defendant also contends the trial court abused its discretion by denying his motion to subpoena K.T.'s mental health records

without conducting an *in camera* review of them. Finally, defendant argues that the court engaged in prejudicial *ex parte* communications with the jury during its deliberations.

¶ 57                                A. Sufficiency of the Evidence

¶ 58    Defendant challenges the sufficiency of the evidence. He argues that it is incredible that, in a house occupied by five other adults, none of them observed any indicia that defendant was abusing K.T., particularly because K.T. asserted the abuse was occurring nearly every day she was present in the home. Moreover, no other responsible adults, such as K.T.'s gymnastics coaches, pediatricians, or other physicians and medical personnel observed any signs of physical or sexual abuse. Further, no one noticed blood in the bathroom, even though K.T. testified that she bled following most of the assaults, and no one heard her crying or any loud noises despite K.T.'s testimony that defendant continually ordered her to be quiet. Defendant additionally contends that the changes in K.T.'s account diminish its credibility—particularly the fact that she added, "belatedly," the detail that defendant had been recording his assaults. We disagree.

¶ 59    The legal principles regarding a challenge to the sufficiency of the evidence are well settled. The guiding principle is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28. We do not retry the defendant or substitute our judgment for that of the trier of fact. *Id.* The conviction will not be disturbed unless the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Id.*

¶ 60    Defendant does not challenge the evidence relating to any individual count; rather, defendant contends that the totality of the evidence fails to persuade and is, as a whole, so unreasonable, improbable, and unsatisfactory as to give rise to a reasonable doubt of his guilt of

- 17 -

any offense. Thus, defendant does not raise a claim regarding any particular issue with any specific count, only that, taken as a whole, the evidence simply does not support the convictions.

¶ 61    Defendant begins by arguing that Amy's testimony suggests that, because "she did not see, hear, or notice anything consistent with [the sexual] assaults taking place," she was "a 'witness' to the fact that these assaults did *not* happen." Likewise, Eric, Lyon, Julie, and the gymnastics coach all testified that they did not see or hear anything suggestive or supportive of K.T.'s claims that defendant regularly sexually assaulted her. Defendant's argument, then, is that, because no evil was seen, no evil occurred, or, the absence of affirmative evidence that any of the three incidents occurred (beyond K.T.'s testimony) is actually affirmative evidence that no incident ever occurred. Defendant's argument therefore contradicts the adage that "the absence of evidence is not evidence of absence." *E.g.*, *People v. Higgins*, 2023 IL App (4th) 220837, ¶ 53.

¶ 62    We believe the adage applies in this case and there are two valid, competing inferences supported by the evidence in the record. As defendant argues, the inference that the incidents never occurred arises because no other witnesses provided corroborating evidence, such as directly observing an incident, observing K.T. weeping after an incident, or hearing K.T.'s cries during an incident.

¶ 63    On the other hand, K.T. consistently testified that defendant took pains to maintain secrecy. He threatened her family and her with dire consequences if she told anyone about the sexual assaults. He engaged in the assaults when no one else was present or when he could get K.T. alone. He told her to be quiet so no one would hear them during an assault. K.T. herself disposed of evidence of the assaults, namely bloody underwear, so the incidents would not be discovered. Amy corroborated this detail, testifying that she believed K.T. was forgetting her underwear at the gym when she changed into her leotard and that she frequently had to buy K.T. new underwear as a

- 18 -

result. Pier testified that child sexual assault offenders perpetrate their offenses in secret and that other adults and caregivers in the home remain unaware of the ongoing abuse. Specifically, Pier testified that it is "very, very rare for non-offending caregivers, or people in the home, to know what is going on, unless they walk in on it." This gives rise to the inference that defendant was very good at maintaining the secrecy surrounding his assaults of K.T. Thus, contrary to defendant's position, the absence of evidence of assault may lead to the inference that defendant effectively maintained the secrecy of the assaults, and this inference is well supported in the record.

¶ 64    Because there are alternative inferences arising from defendant's claim of absence of evidence, we cannot say that the lack of direct observation—either walking in on an assault in progress, overhearing an assault, observing bruises, and the like—compels the conclusion that the evidence is insufficient. Indeed, because there are alternative inferences, we are required on review to make the inference that supports the conviction. *Jones*, 2023 IL 127810, ¶ 28.

¶ 65    Defendant also argues that K.T.'s accusations, which evolved to include claims made after her initial victim sensitive interview that defendant recorded some of the assaults, are so incredible as to render the entirety of K.T.'s testimony unbelievable. Defendant specifically notes that the police took a substantial amount of electronic equipment from his home and found no recordings of him sexually assaulting K.T. Defendant also emphasizes that Eric observed no recording device ever in the adjacent bathroom, and he concludes that this lack of evidence affirmatively disproves K.T.'s claim that defendant had recorded her. We disagree.

¶ 66    In addition to running afoul of the adage that the absence of evidence is not evidence of absence, defendant's argument is not supported in the record. It is true that no recordings of abuse were recovered. However, defendant was not accused of any offense until March 2024, nearly five years after K.T. moved out of defendant's home, and the claim that defendant had recorded

the assaults was made weeks after the initial outcry. It is possible that defendant was able to dispose of or destroy any recordings he had made. Likewise, that Eric did not observe any recording device in that bathroom is unsurprising. K.T. did not testify that the device was permanently installed in the bathroom somewhere; rather, defendant would carry it into the location where the assault would occur and carry it out with him after the assault concluded. This detail speaks to the care and pains defendant took to maintain secrecy and lends some weight to the inference that defendant was quite adept at maintaining the secrecy surrounding his assaults of K.T. Finally, Pier testified that child-victims do not provide linear and chronological accounts of their experiences. This testimony explains in some measure the belatedness of K.T.'s disclosure that defendant recorded some of the assaults. While K.T. was considerably older at the time of the trial than she was when the sexual abuse occurred or even when she first made her disclosure, she was still a child, and she was still processing her experiences. We cannot say that the lack of recorded evidence undermines K.T.'s account of the offenses and renders the evidence insufficient.

¶ 67    Contrast defendant's argument with what K.T. actually described in each incident: in the first incident, occurring after dinner and located in the downstairs bathroom, defendant barged in and punished K.T. for throwing away her dinner by placing his fingers in her vagina. He threatened K.T. and her family with eviction, and K.T. "didn't know where [her] family would go" if defendant threw them out. Next, K.T. described an assault in the upstairs bathroom that occurred around dinnertime after she returned from gymnastics. The rest of the family was apparently preparing dinner while K.T. showered. Defendant entered the bathroom and told K.T. that he was going to punish her because she had been fighting with her parents that day. Defendant placed his fingers, then his penis, in her vagina. K.T. cried and asked him to stop, and defendant told her to be quiet. The third incident occurred early on a Saturday morning when K.T. awoke and went

- 20 -

downstairs to watch a cartoon. Defendant entered the room and told her he was going to punish her for being a bad child that night. He inflicted his usual punishment: placing his fingers and penis in her vagina. Defendant also told K.T. to be quiet so as not to wake up the household. After defendant finished and left, K.T. remained, distraught and crying.

¶ 68 Each incident followed a similar pattern. Defendant would encounter K.T. when she was away from the others in the house, defendant would inform K.T. that he was going to punish her, and defendant would place his fingers and penis in K.T.'s vagina. Defendant cautioned K.T. to be quiet so as not to alert any others in the household. Defendant would then threaten to throw K.T. and her family out of the house.

¶ 69 Contrary to defendant's contention, there is nothing improbable, impossible, or incredible about any of K.T.'s descriptions of the three incidents. Defendant isolated his victim away from the others in the household while they were engaged in other activities or asleep. Defendant seems to have followed almost a ritual of punishment: accusation of wrongdoing, invocation of the need to be punished, and administration of the sexually abusive punishment. Rather than impossible or improbable, K.T.'s descriptions are all too possible. The repetitive and nearly ritualistic nature lends credence to K.T.'s account, with the ritual offering a glimpse into why defendant was perpetrating this abuse upon K.T., as well as emphasizing that defendant was careful to conduct the abuse in secret and to maintain its secrecy.

¶ 70 We note that the testimony of a single witness can be sufficient to support a conviction, if the testimony is positive and credible, even if it is contradicted by the defendant. *People v. Harris*, 2018 IL 121932, ¶ 27. K.T.'s testimony was positive and credible and offered no physical impossibilities. K.T. testified that the assaults occurred away from the others in the household and at times when the others were likely to be distracted, pursuing their own activities, or asleep, and

- 21 -

details were strongly corroborated. For example, K.T. stated she frequently bled after the assaults, so she disposed of the bloody underwear. Amy testified that K.T. was continually running out of underwear, thought to be forgotten and disposed of at K.T.'s gymnastics practices, and that she frequently had to buy K.T. new underwear. Amy also testified that, after they moved out of defendant's home, K.T. would "freak the hell out" when the family was going to visit defendant at his house. Additionally, K.T.'s accounts of the incidents were consistent to Krueger and the police—K.T. informed Krueger that defendant, her step-grandfather, sexually assaulted her causing pain and bleeding, just as she testified during trial. Based on this record, we cannot say that K.T.'s testimony was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt. *Jones*, 2023 IL 127810, ¶ 28.

¶ 71    Defendant relies on *People v. Schott*, 145 Ill. 2d 188 (1991), *People v. Herman*, 407 Ill. App. 3d 688 (2011), and *People v. Yeargan*, 229 Ill. App. 3d 219 (1992), to illustrate similar evidentiary deficiencies where courts have determined that the evidence was insufficient to support a conviction. In *Schott*, 145 Ill. 2d at 206-209, the complainant admitted that she lied "a lot," she was impeached from a previous proceeding in which she claimed the sexual assault occurred in the fall versus at trial, in which she claimed it occurred in the spring. The complainant also stated in the previous proceeding that the abuse occurred almost every day, whereas at trial, she testified it happened only one time. *Id.* at 207. The complainant also recanted her accusations to a police officer and to an employee of the Department of Children and Family Services, explaining to each that she made up her allegations because she was angry with the defendant. *Id.* Here, by contrast, K.T. never recanted, her account of the events remained consistent to the sexual assault nurse, to the police investigators during the victim sensitive interview, and to the jury during trial, and she never admitted to lying. We find *Schott* inapposite.

¶ 72    In *Herman*, the reviewing court determined that the complainant's account of the offense was fraught with contradictions and inconsistencies. First, the victim was an admitted crack addict, who denied smoking "rocks" in a deposition, yet at trial, she claimed to have smoked between six and eight rocks during the night of the offense. *Herman*, 407 Ill. App. 3d at 704-05. The complainant gave varying timelines for the offense, with some of her accounts during her outcry to police placing the time of the sexual assault as early as 3 a.m., and other statements placing the assault as late as 5 a.m.. At trial, the complainant again gave a different timeline, now with the assault occurring between approximately between 6 and 6:30 a.m., lining up with a gap in the defendant's known and confirmed whereabouts and activities. *Id.* at 705-06. The complainant's testimony was also contradicted by her daughter's testimony regarding a shared cell phone and casting doubt on the complainant's account of her activities. *Id.* at 706. In contrast, the defendant's account described a consensual sexual encounter occurring at about 11 p.m. the previous night and was internally consistent, unimpeached, and unrebutted. *Id.* at 708-09.

¶ 73    In this case, K.T.'s account was consistent across the several sources to whom she presented it—to the sexual assault nurse, the police, and at trial. Her accounts of the offenses also described clearly plausible occurrences and activities. K.T. added details after her initial interviews, such as defendant's recordings of the encounters, but this later disclosure was addressed by the expert testimony of Pier, explaining that children do not divulge details of sexual assault linearly or chronologically. Additionally, the lack of recordings is explained by the long period of time between the initial disclosure of the assaults and the later disclosure of the recording, leaving defendant with ample time to erase or destroy evidence of the recordings. Viewing the totality of the evidence we cannot say it was so fraught with inconsistency, unreasonableness, and

improbability as to give rise to a reasonable doubt of defendant's guilt. *Herman*, therefore, provides little support to defendant's contention of incredibility.

¶ 74    Next, in *Yeargan*, 299 Ill. App. 3d at 230-35, the reviewing court carefully analyzed the record to conclude that the evidence was insufficient to support the convictions in that case. There, the complainant described a forcible sexual assault in which she was restrained and her clothes forcefully removed, but her clothes were undamaged and her body bore no indications of injury or physical abuse from the forcible assault. *Id.* at 230-31. Additionally, the court questioned her choices, such as cutting down a dark alley where the complainant testified the assault occurred, instead of taking a safer, busier, and well-lit route home along a major street, as well as her description of some of the details of the event, such as the fact that she maintained control of a bag of groceries she was carrying without spilling them on the ground during the attack, or that her dog neither barked nor ran free when she was assaulted. *Id.* at 231-32. Additionally, the court questioned whether the assault could even have occurred as described, as one defendant was required to have ejaculated 3 or 4 times in a period of 15-20 minutes, and the other defendant was required to have ejaculated twice in that same period. *Id.* at 233-35. The court believed that such a feat was nearly impossible, even without the benefit of expert testimony concerning the capabilities of the male human body. *Id.* at 233. All of these inconsistencies and impossibilities led the court to conclude that the complainant's testimony was incredible, and no rational trier of fact could have accepted it. *Id.* at 235.

¶ 75    In this case, by contrast, K.T. described defendant's careful secrecy and frequent threats and admonitions for her to be quiet as he sexually assaulted her. Moreover, she described that defendant would assault her after she returned from gymnastics, when the other persons of the household were engaged in preparing dinner or doing other activities, which minimized the

chances of discovery. The abuse itself was described consistently and was, unfortunately, of a nature that was eminently possible for a man in his 50s to perpetrate—digital and penile penetration of a young, scared child. K.T. described nothing inherently contrary to human experience, such as multiple ejaculations within a very brief time, thus confounding the limits of human sexual physiology; rather, she described "punishment" occurring nearly every day, leading to the reasonable inference that defendant engaged in these actions when he believed it was safe and opportune to do so. Her descriptions of the events were consistent to the several parties who received them: the sexual assault nurse, the police during the victim sensitive interview, and the jury during the trial. Thus, we cannot say that K.T.'s account was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Yeargan* is therefore inapposite and provides no support for defendant's position that K.T.'s testimony was beyond belief.

¶ 76    For the foregoing reasons, we cannot say that K.T.'s account of the three incidents was so unreasonable, improbable, or unsatisfactory that it could not be deemed credible by a rational trier of fact. *Jones*, 2023 IL 127810, ¶ 28. Moreover, viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of each charged offense beyond a reasonable doubt. *Id.* Therefore, we reject defendant's argument that the evidence was insufficient to support his convictions.

¶ 77                                   B. False Accusations

¶ 78    Defendant next argues on appeal that the trial court abused its discretion when it refused his request to introduce evidence of K.T. making additional accusations of sexual assault occurring three or four years after she and her family moved from defendant's home. It is well settled that the admissibility of evidence rests within the court's sound discretion, and its decision regarding

that admissibility will not be disturbed absent an abuse of that discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). An abuse of discretion will be found only where no reasonable person would take the court's view, where the court's decision is arbitrary, fanciful, or unreasonable (*id.*), or where the court's ruling rests on an error of law (*People v. Prather*, 2012 IL App (2d) 111104, ¶ 20).

¶ 79    Initially, in September 2024, defendant filed his third motion *in limine* seeking to introduce evidence of other "demonstrably false" accusations K.T. made against him. Thereafter, the State filed a response/motion *in limine* to bar evidence of K.T.'s prior sexual activity under the rape shield statute (725 ILCS 5/115-7 (West 2024)). Defendant sought to introduce evidence of three false accusations. First, defendant contended that K.T. had made a false accusation in connection with a September 23, 2023, birthday party for one of defendant's grandchildren and K.T.'s cousin. According to defendant's motion, K.T. alleged that, after swimming in the Belvidere home's pool, she was changing in a bathroom out of her wet swimsuit when defendant entered the bathroom and sexually assaulted her. Defendant alleged that he disclosed "numerous witnesses prepared to testify that no swimming occurred on that occasion," and K.T. modified her story to claim that the incident occurred around July 4, 2022. Second, defendant contended that K.T. had added a new accusation of sexual assault, this time occurring at Scott Vanderwest's home in McHenry. According to defendant, K.T. claimed that defendant entered the bathroom she was using and announced that she needed to be punished for dropping and breaking a bottle of iced tea. Vanderwest, defendant's son-in-law, was prepared to testify that the bathroom where the assault purportedly took place was adjacent to the home's kitchen, that he was in the kitchen during the purported time of the assault, and that he neither observed defendant enter the bathroom while it was occupied by K.T. nor heard any unusual noises coming from that bathroom. Vanderwest would further testify that K.T.'s brother dropped the bottle and that K.T. had injured her hand by

closing it in a car door and was outside with ice being applied to her hand. Third, defendant contended that K.T.'s claims that defendant had recorded some of his sexual assaults constitute a new false accusation, because searches of defendant's seized electronic devices revealed no recordings to support this accusation.

¶ 80 Following a hearing on defendant's motion *in limine* and the State's response/rape shield motion *in limine*, the trial court denied defendant's motion and granted the State's. The court determined first that, under the rape shield statute, because K.T. was a minor and unable to consent to sexual conduct, the consent exception to the rape shield statute (725 ILCS 5/115-7(a)(1) (West 2024)) was unavailable. Next, the court determined that a defendant is entitled to introduce evidence of false accusation if the defendant could show the complainant's bias, prejudice, or motive to testify falsely. *Id.* § 115-7(a)(2). Thus, defendant could introduce evidence that K.T. made false accusations of sexual assault in the past or offer evidence to explain physical facts such as the presence of semen, pregnancy or physical condition indicative of sexual intercourse. However, neither the Belvidere claim, the Vanderwest claim, nor the electronic recording claim fit within this exception to the rape shield statute, and defendant's proffered evidence was inadmissible. For such evidence to be admissible, it must give rise to an inference that the witness has something to gain or lose due to his or her testimony, and the evidence used to show this must not be remote or uncertain.

¶ 81 The trial court next considered defendant's specific proffers regarding the false accusations. Regarding the electronic recordings, the court concluded that the lack of recordings of sexual assaults did not mean it was a false accusation because there were many possible explanations for the lack of corroborative evidence of the recordings. The court concluded that the Belvidere claim was not a false accusation because the proffered evidence that there was no

swimming proved only that no swimming took place on September 23, 2023, but failed to prove there was no sexual assault. Similarly, the court concluded that Vanderwest's proffered testimony proved that K.T. did not drop the bottle of iced tea and that Vanderwest did not see defendant and K.T. in the bathroom, not that K.T.'s claim that defendant sexually assaulted her in the Vanderwest home was false. The court determined that defendant's proffers did not support an inference that K.T. possessed an improper interest, bias, or motive to lie. Additionally, the Belvidere and Vanderwest incidents occurred several years after the events the jury would hear about, and the false accusations were ultimately collateral issues with only speculative relevancy at best, thus providing little probative value regarding the issues that would be explored at trial.

¶ 82    Defendant argues that this case turns solely on K.T.'s credibility because there was no physical evidence to support K.T.'s claims, K.T. delayed her reporting of the claims, and no other witnesses provided corroborative testimony. Defendant characterizes the false-accusation evidence as an effort to demonstrate K.T.'s bias and motive to testify falsely against him rather than an attack on her reputation for truthfulness. Defendant contends that he should have been allowed to introduce evidence demonstrating K.T.'s pattern of making false accusations against defendant because she resented him for reasons other than the alleged conduct, and he wished to reveal the critical information that she changed the details of her claims after the inconsistencies and impossibilities were revealed to the State which, he maintains, proves her motive to testify falsely. Defendant concludes that the trial court abused its discretion by precluding evidence of the false accusations under the rape shield statute.

¶ 83    The purpose of the rape shield statute is to prevent a defendant from harassing or humiliating the victim with evidence of her reputation for chastity or specific acts of sexual conduct. *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42. It is not meant to be mechanically

- 28 -

applied or exclude evidence that bears directly on a defendant's guilt or innocence. *Id.* Therefore, under the constitutionally required exception, evidence which is directly relevant to the matters at issue in the case may be admitted even though it concerns the victim's sexual history. *Id.* Relevance is key, and the victim's sexual history is not constitutionally required to be admitted unless it meaningfully contributes to the fact-finding process. *Id.* This means that the statute's exclusion of evidence of a victim's sexual history must, in certain circumstances, give way to the defendant's constitutional right to confront witnesses. *People v. Okoro*, 2022 IL App (1st) 201254, ¶ 55. A defendant's constitutional right to confront witnesses will prevail over the statutory exclusion where the evidence of the victim's past sexual conduct is relevant and tends to establish bias, prejudice, or motive to lie. *Id.* To establish bias, prejudice, or motive to lie, the evidence must give rise to the inference that the witness has something to gain or lose by his or her testimony, and, therefore, the evidence must not be remote or uncertain. *People v. Cookson*, 215 Ill. 2d 194, 214 (2005).

¶ 84 Defendant contends that the Belvidere accusation was a fabrication and was thus admissible under the constitutionally required exception. Defendant reasons that, when the K.T. learned that defendant had a multitude of witnesses to refute her accusation that he assaulted her in the bathroom as she was removing a wet bathing suit because no swimming occurred at the September 23, 2023, birthday party, she simply changed the date to July 4, 2022, when swimming was possible. Defendant then represented that the only date both he and K.T. were present at the Belvidere house was September 23, 2023. Defendant concludes that K.T. was thus caught in a lie, and this evidence had direct bearing on her credibility.

¶ 85 We agree with the trial court that the Belvidere event is collateral to the events covered at trial because it is not relevant to a material issue in this case. *People v. Marshall*, 2025 IL App

(4th) 240368, ¶ 58.  While K.T. revealed the Belvidere event at the same time she revealed the events at issue in this case, the Belvidere event is alleged to have occurred three or four years after K.T. and her family moved from defendant's home.  It occurred in a different location than the incidents at issue in this case, and the matter is currently pending before the Boone County circuit court, which is the appropriate venue to determine whether those allegations can be proved beyond a reasonable doubt.  The temporal and physical remoteness of the Belvidere event renders it of dubious value toward any issues in this case.  See *Cookson*, 215 Ill. 2d at 216 (to be admissible, evidence must not be remote or uncertain).

¶ 86   Defendant contends the Belvidere accusation bears directly on K.T.'s credibility, because it is demonstrably false.  We disagree.  Details may be incorrect, but that does not necessarily give rise to an inference that K.T. was lying.  The issues of the date of the occurrence or the saturation of her swimwear are simply pieces of the broader mosaic of the Belvidere allegations.  That a detail may be incorrect may prevent the State in that case from satisfying its burden of proving the allegations beyond a reasonable doubt, particularly if there are errors in enough of the details presented, but all that was demonstrated that swimming did not occur, or the date or circumstances may have not been correctly remembered.  In the end, the Belvidere event was a birthday party at a home with a swimming pool on a warm day—whether K.T. was changing from wet or dry swimwear when defendant cornered her in the bathroom is immaterial to whether he sexually assaulted her as punishment for throwing away food, fighting with her parents, or simply being "a bad child" the night before.  Moreover, whether defendant sexually assaulted K.T. at the Belvidere home has no bearing on whether he sexually assaulted her three or four years earlier when K.T. was living in his home.  The Belvidere event is thus collateral to the issues in this case.

¶ 87    In addition, defendant does not try to explain what K.T. had to gain or lose in making the Belvidere accusation, and we cannot see any particular benefit or detriment to her. Defendant suggests that K.T. was angry with defendant because her stepfather, defendant's stepson, had caused the breakup of the marriage of her mother and biological father. The evidence showed that K.T. and defendant did not get along, but also that defendant yelled at K.T. and C.T. for being boisterous inside of the house. Julie was able to get along with K.T., and K.T. apparently harbored no resentment toward Julie even though she was Eric's mother. Obviously, K.T.'s psychology of resentment is an unexplored and speculative issue, but it is instructive to note that no similar animosity arose between Julie, her stepfather's mother, and K.T. as arose between defendant and K.T. The anger or revenge angle defendant suggests is too tenuous to demonstrate any gain to K.T. for testifying. See *id.* at 214 (evidence admitted under constitutionally required exception must give rise to the inference that the witness has something to gain or lose by his or her testimony). Moreover, this suggestion is undermined because Julie was not a similar object of K.T.'s supposed ire undermines this suggestion.

¶ 88    Finally, we perceive no inference arising from the proffered evidence of the Belvidere event that establishes a motive for K.T. to lie. The Belvidere event shows infirmity in detail, not in overall structure. K.T. recounted that, just as at his own home, defendant cornered her in the Belvidere bathroom and abused her, as he frequently did when she lived in defendant's home. A faulty remembrance is an error, not necessarily a lie. We reject defendant's contention.

¶ 89    A similar analysis applies to the Vanderwest accusation. It, too, is remote in time and location, and the errors identified by defendant illustrate that details were misremembered or mistakenly given.

¶ 90 The recording allegation is likewise remote and the fact that recordings no longer existed does not prove the falsity of the allegation, only that recordings were not found. As discussed above, the amount of time that passed provided defendant opportunity to secrete or destroy any recordings, so the absence of video evidence has little impact on the truth or falsity of the allegations. Further, because of this, no adverse inference to K.T.'s bias, prejudice, or motive to lie can be established.

¶ 91 Defendant argues that the Belvidere accusation, the Vanderwest accusation, and the recording allegation constitute a pattern of false accusations sufficient to demonstrate a motive to lie, or of K.T.'s bias or prejudice against defendant. We disagree. Aside from the fact that these matters are solidly collateral to the issues in this case, they also fail to demonstrate falsity, showing simply mistake, meaning there is no pattern. Both the recording allegation and the Belvidere accusation are reasonably contemporaneous with K.T.'s initial outcry to the police. (The timeframe for the Vanderwest allegation has not been established in the record, and thus we cannot comment on whether it was made before or after the initial interview.) Moreover, there are no series of accusations extending over any substantial length of time that were disproved, recanted, or otherwise found to be untrue. Rather, the allegations here cover events occurring at disparate times, and defendant appears to conflate the disparate time of the occurrence with the making of the allegation itself.

¶ 92 Defendant relies on *People v. Nicholl*, 210 Ill. App. 3d 1001, 1011 (1991) for the proposition that a subsequent allegation of uncharged abuse was admissible where there was testimony it could not have occurred on the day alleged. We find *Nicholl* distinguishable because, while the defendant proffered evidence that he and the victim had no contact on the specific day, additional proffered evidence showed that the victim's mother threatened retribution against

defendant and the subsequent allegation of uncharged abuse was deemed unfounded because the victim had no independent recollection and admitted to the interviewer that his mother told him what to say about the incident. *Id.* at 1007-08. Here, there is no evidence that either Julie, Eric, or K.T. threatened retribution against defendant, and there is no evidence that K.T. was prompted by anything beyond what she testified about—her fear that defendant would do to her sister what he had done to her.

¶ 93    Accordingly, we hold that the trial court did not abuse its discretion in granting the State's response/motion *in limine* to preclude the evidence of the Belvidere and Vanderwest accusations pursuant to the rape shield statute.

¶ 94                    C. *In Camera* Review of K.T.'s Medical Records

¶ 95    Defendant argues that the trial court abused its discretion in denying his request to subpoena K.T.'s medical records without conducting an *in camera* review to determine their relevance. We disagree.

¶ 96    On September 10, 2024, defendant filed a motion requesting the trial court issue a subpoena for K.T.'s patient records from her therapist. Defendant's motion was supported by an unsigned affidavit from his wife, Julie. In the motion, defendant contended that the State had placed K.T.'s mental health in issue through its July 26, 2024, motions *in limine* seeking to admit evidence of K.T.'s statements to Krueger concerning self-harming behaviors and to admit expert testimony concerning accommodation syndrome and related mental health issues. Specifically, defendant urged the court to conduct an *in camera* review of the therapist's records because they may have contained information about K.T.'s reports of self-harm and records related to any accommodation syndrome diagnosis, "other diagnoses, lack of diagnoses or inconsistent information about these topics." The unsigned affidavit asserted that Julie, Amy, and Eric could provide information about

K.T.'s behavioral issues, lying, and two suicide attempts. It also asserted that a "concerned individual" contacted Julie regarding K.T.'s treatment with her therapist. The unsigned affidavit related that someone affiliated with the therapist's employer told the concerned individual that the therapist's treatment notes contained information bearing on K.T.'s credibility. The affidavit also asserted that K.T. blamed Eric for the dissolution of her mother and biological father's marriage. As noted, however, the affidavit remained unsigned and unsworn.

¶ 97 The State and the therapist filed responses in opposition. The State's response highlighted the procedural irregularities concerning improper notice and the unsigned affidavit. The State characterized defendant's request for a subpoena as a generalized fishing expedition seeking only impeachment information without sufficiently showing the necessary relevance to overcome the privilege and confidentiality associated with the mental health records pursuant to section 10 of the Mental Health and Developmental Disabilities Act (Act) (740 ILCS 110/10 (West 2024)). The State also contended that much of what defendant purported to seek was available through other sources, such as K.T.'s family members. The therapist's response noted that defendant had filed the same request for a subpoena in the Boone County prosecution, that the Boone County circuit court had conducted an *in camera* review of the therapist's records and, on July 26, 2024, denied defendant's request to issue a subpoena. The therapist also challenged the relevance and materiality of the records sought and asserted that another *in camera* inspection of her records would be detrimental to K.T.'s well-being and harm her therapeutic progress.

¶ 98 On October 10, 2024, the trial court denied defendant's motion without first conducting an *in camera* review of the sought mental health records. The trial court noted the procedural irregularities with notice and the unsigned and unsworn affidavit but decided, in the interests of judicial economy, to address the merits presented, effectively declining to deny defendant's motion

on procedural grounds. The court determined that defendant's request was a generalized fishing expedition because defendant had not attempted to demonstrate that the records did, in fact, contain impeachment information. Next, the court determined that the family members had sufficient information regarding K.T.'s episodes of self-harm, so this information was readily available to defendant without the need to investigate confidential mental health records. Last, the court determined that the claim that the therapist's records were necessary to rebut the State's contemplated expert testimony about accommodation syndrome placed the cart before the horse, because for such testimony to be admissible in the first place, defendant first would need to challenge K.T.'s credibility. Therefore, until K.T.'s credibility was at issue, defendant did not need the mental health records to rebut the State's ability to present evidence of accommodation syndrome.

¶ 99 Defendant argues that the trial court abused its discretion by failing to at least hold an *in camera* inspection of the records sought to be subpoenaed. We disagree.

¶ 100 A trial court's discovery rulings are generally reviewed for an abuse of discretion; nevertheless, the appellate court reviews *de novo* whether the defendant's due process rights have been infringed and whether any prejudice may have accrued. *People v. Sauls*, 2022 IL 127732, ¶ 32. To justify issuing a subpoena for mental health records, the moving party must show that: (1) the records are evidentiary and relevant; (2) the information cannot be otherwise procured reasonably in advance of trial through the exercise of due diligence; (3) the moving party cannot properly prepare for trial without inspecting the records and that, without inspecting the records, the trial will be unreasonably delayed; and (4) the request for the records is a good faith request and not simply a general fishing expedition. *Id.* ¶ 33.

¶ 101   Mental health records, however, are privileged from disclosure.  Specifically, under section 10(a) of the Act, "a recipient, and a therapist on behalf and in the interest of a recipient, has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications."  740 ILCS 110/10(a) (West 2024).  Courts have developed a two-step procedure in the discovery of mental health records that balances a defendant's right to confront witnesses with a patient's privilege of confidentiality.  *People v. K.S.*, 387 Ill. App. 3d 570, 573-74 (2008).  First, the defendant must show that the requested mental health records are material and relevant to the witness's credibility.  *Id.*  If the defendant overcomes this burden, the records are discoverable.  *Id.*  If the witness or the therapist asserts his or her statutory privilege, the trial court should perform an *in camera* review of the records (*id.*), disclosing only those records that are material and relevant (*People v. Bean*, 137 Ill. 2d 65, 99 (1990)).  However, the defendant's right to confront witnesses does not "encompass the right to full knowledge about a witness' mental health problems in the hope of finding impeaching information that a trial judge might overlook."  *Id.* at 100.

¶ 102   Here, defendant asked the trial court to issue a subpoena for K.T.'s mental health records and for the court to conduct an *in camera* review of those records.  Defendant asserted two grounds of relevance: that the records could disclose instances of K.T.'s self-harm, and that the records may have contained or omitted diagnoses of accommodation syndrome, rape trauma syndrome, post-traumatic stress disorder, and other related conditions.  The court determined that defendant had failed to demonstrate sufficient relevance and materiality for it to conduct an *in camera* review of K.T.'s records.  We agree.

¶ 103   Regarding self-harm, the unsigned affidavit showed that defendant was well aware from K.T.'s mother and stepfather that she had twice attempted suicide.  The information was therefore

available from other sources and defendant was not entitled to overcome K.T.'s or the therapist's assertion of privilege. *Sauls*, 2022 IL 127732, ¶ 33. Rummaging through the records to uncover inclusions or omissions of descriptions of self-harm would have been nothing more than a blatant fishing expedition. See *Bean*, 137 Ill. 2d at 100 (a defendant is not entitled to search through the entirety of a victim's or witness's mental health records in the hopes of finding impeaching information).

¶ 104 Regarding diagnoses, defendant sought to use the presence, or more particularly the absence, of diagnoses of accommodation syndrome and related conditions in K.T.'s mental health records to impeach and rebut the expected testimony of the State's expert, Pier. First, defendant did not establish that K.T.'s therapist was qualified to make these sorts of psychiatric diagnoses, thus failing to establish even the modicum of relevance and materiality necessary to trigger an *in camera* review. Second, Pier testified generally about accommodation syndrome and related conditions, as well as the behaviors that survivors of sexual assault and child sexual assault exhibit in relation to those conditions. She did not testify specifically about K.T. Moreover, the State's motion *in limine* seeking admission of Pier's testimony specifically disclaimed that she would testify about K.T. or her treatment or that she would review any of K.T.'s treatment records in forming the opinions she would deliver at trial. Defendant thus could have no expectation that K.T.'s treatment records would rebut or impeach Pier—only that they may have contained potentially useful impeachment against K.T. herself. Thus, defendant's rationale for seeking the diagnostic information was actually little more than a prohibited fishing expedition unrelated to Pier's proposed and eventual testimony. *Id.*

¶ 105 Defendant argues that the trial court's ruling contravenes *Sauls*, which he describes as setting a low bar for allowing an *in camera* review of requested documents. Low bar or no, *Sauls*

still requires the request to have been made in good faith and not intended as a general fishing expedition. *Sauls*, 2022 IL 127732, ¶ 33. Because the self-harm information in K.T.'s mental health records was readily available from other sources, the request for the records is a simple excuse to rummage through them in hopes of finding something, anything, to impeach K.T.'s testimony. Similarly, because the records were unrelated to Pier's proposed and actual testimony, it cannot be said that the discovery request was made in good faith or not intended as anything but a fishing expedition. Defendant was, therefore, unable to satisfy the first step of showing a nonabusive purpose and demonstrating the materiality and relevance of the requested records. *Sauls*, 2022 IL 127732, ¶ 33; *K.S.*, 387 Ill. App 3d at 573-74.

¶ 106 Defendant argues that the trial court trapped him in a Catch-22 situation by denying the request to review K.T.'s mental health records *in camera*. Defendant reasons that the court ruled before assessing whether the accommodation syndrome evidence was even admissible, leaving him unable to prepare for Pier's testimony. Further, by admitting the accommodation syndrome evidence without ever having reviewed K.T.'s treatment records, defendant had no way to rebut the jury's impression that any behavior K.T. exhibited that happened to be consistent with accommodation syndrome and related conditions was caused by defendant's sexual abuse. We disagree. As noted, defendant sought K.T.'s treatment records for the presence or absence of various diagnoses, but Pier's proposed and actual testimony explained the syndromes generally and did not cover K.T., her treatment, or her records. In short, the request was not made in good faith but was intended to allow defendant to search through the entirety of K.T.'s treatment records hoping to find nuggets of impeachment material. *Bean*, 137 Ill. 2d at 100.

¶ 107 The reasoning of our recent decision, *People v. Valderama*, 2025 IL App (2d) 240574, which defendant does not address, is also instructive. There, the defendant sought counseling

records of a sexual assault victim which were protected under the Act. *Id.* ¶ 15. The defendant's request was granted, and the trial court issued a subpoena to the provider to produce the records for an *in camera* inspection. *Id.* ¶ 17. The provider moved to quash the subpoena and asserted the privilege on behalf of the victim; the court denied the motion to quash and held the provider in contempt, from which the provider appealed. *Id.* ¶¶ 22-24. We considered the defendant's purpose in seeking the protected records, which was for impeachment of the victim's testimony, and determined that the defendant had not demonstrated that the records would provide a source of impeaching material that was otherwise unavailable. *Id.* ¶ 42. Specifically, the defendant was well aware of the victim's other statements concerning the alleged sexual assault including those she made to the police and to her family members, the inconsistencies between which formed an otherwise available the basis for the defendant's contemplated impeachment. *Id.* ¶¶ 42-43. We held that, because the defendant had not made even a minimal showing that the records likely contained impeaching material that was otherwise unavailable from the victim's statements to police and to her family members, there was no need for the court to conduct an *in camera* inspection of the records. *Id.* ¶ 44.

¶ 108 *Valderama*'s reasoning is applicable here. Defendant was aware of K.T.'s instances of self-harm from the family and that the State was seeking to introduce general testimony concerning accommodation syndrome, but he failed to demonstrate that he was seeking the records for any purpose beyond fishing for the same impeachment material that was otherwise readily available through other sources. Under *Valderama* as well, then, defendant's pursuit of K.T.'s treatment records was improper, and the trial court here correctly refused to compel their production or inspect them *in camera*. *Id.*

¶ 109   We conclude that the trial court did not abuse its discretion in denying defendant's request to issue a subpoena or hold an *in camera* review concerning the requested mental health records.

¶ 110                    D. Pier's Testimony Regarding Accommodation Syndrome

¶ 111   Defendant argues that the trial court abused its discretion in admitting Pier's testimony concerning accommodation syndrome.  The admission of evidence, including expert testimony, is within the sound discretion of the trial court, and we will not disturb the court's ruling absent an abuse of that discretion.  *People v. Lerma*, 2016 IL 118496, ¶ 23.

¶ 112   Defendant argues that the trial court erred in admitting Pier's testimony during the State's case-in-chief because testimony about accommodation syndrome is only admissible if the defendant first attacks the victim's credibility.  *People v. Dempsey*, 242 Ill. App. 3d 568, 589 (1993).  We disagree.

¶ 113   We note first that the State argues defendant has forfeited this contention because he did not include this issue in his written posttrial motion.  We need not address the State's contention because the record clearly rebuts defendant's claim that the evidence of accommodation syndrome was presented before defendant had challenged K.T.'s credibility.

¶ 114   We also note that *Dempsey* held that "that evidence of [accommodation syndrome] is admissible in the State's case-in-chief but only where the defendant, through cross-examination of the State's witnesses, has first attacked the credibility of the victim by introducing evidence of recantation, delayed reporting, inconsistencies, or other means of impeachment." *Id.*   Here, K.T., Amy, and Eric all testified prior to Pier taking the stand.  Defendant cross-examined K.T. about her previous disclosure that defendant sexually assaulted her every day, that she visited her biological father out of state, suggesting that the every-day assaults could not have happened in her absence, that she and defendant had a contentious relationship, that the location of the

- 40 -

bedrooms and bathrooms suggested that others in the household should have heard any assaults, the date the final sexual assault occurred, and K.T.'s disclosure that defendant recorded some of the assaults, but no recordings were recovered. This questioning on cross-examination directly implicated K.T.'s credibility.

¶ 115  In addition, defendant cross-examined Amy concerning the contentious nature of the relationship between K.T. and defendant, and about whether she noticed unusual bruising, whether she heard K.T. crying in the bathroom, and whether she observed defendant enter the bathroom that K.T. occupied. This cross-examination was designed to cast doubt that the events K.T. had described even occurred. Likewise, defendant cross-examined Eric about difficulty operating the downstairs television (suggesting that K.T. could not have turned on the television by herself, in turn suggesting that SpongeBob incident was wholly fabricated), whether Eric heard K.T. crying in the bathroom, whether he observed defendant enter a bathroom occupied by K.T., whether he observed any recording devices in the bathroom, and whether he observed any unusual bruising on K.T.. This cross-examination also challenged K.T.'s credibility. Thus, defendant had firmly placed K.T.'s credibility in issue before Pier testified about accommodation syndrome. We therefore reject defendant's contention.

¶ 116  Defendant also argues that Pier's testimony concerning accommodation syndrome was not supported by evidence concerning K.T.'s actual symptoms, if any. For example, Pier discussed symptoms like nightmares, flashbacks, sleeping and eating issues, excessive promiscuity, drug use, suicidal ideation, and negative feelings of self-esteem, but emphasized that there was no evidence that K.T. experienced any of these symptoms. Defendant reasons that expert testimony about generic symptoms that a generic victim may experience, which does not match the evidence introduced at trial about the actual symptoms the specific victim experienced, improperly impinges

upon the jury's responsibility to determine credibility and assess the facts of the case, relying on *People v. Simpkins*, 297 Ill. App. 3d 668, 682-83 (1998). We disagree.

¶ 117 Defendant misreads *Simpkins*. There, the court held that the expert's testimony about recantation and the reasons for recantations by child victims was improper where there was no evidence that any of the reasons for recantation applied to the victim in that case. *Id.* at 683. The expert's testimony therefore did not aid the jury to reach its conclusion, and it impermissibly impinged upon the jury's responsibility to determine the witnesses' credibility and to assess the facts of the case. *Id.* The court interpreted the testimony about reasons child-victims may recant as commentary on the victim's credibility in that case. *Id.* However, the court distinguished the specific recantation testimony from expert testimony describing general behaviors shown by sexually abused child-victims, deeming the general-behavior testimony to be akin to circumstantial evidence, allowing the jury to match evidence of the victim's behaviors to the expert's discussion of generic behaviors, which would let the jury draw its own conclusion about whether the victim's exhibition of some of those behaviors supported an inference that the victim had been sexually abused. *Id.* Here, Pier testified about what symptoms generic child sexual abuse victims may experience which does not run afoul of *Simpkins*. We reject defendant's contention.

¶ 118 Accordingly, we hold that the trial court did not abuse its discretion, either in the timing of the admission of Pier's testimony or in substantively admitting the content of Pier's testimony.

¶ 119                                  E. Completeness Doctrine

¶ 120 Defendant argues that the trial court abused its discretion when it precluded him from employing either the common law completeness doctrine or Illinois Rule of Evidence 106 (eff. Jan. 1, 2011) to contextualize certain excerpts from his statement to Berillo to prevent it from misleading the jury. During defendant's cross-examination, he was asked, "isn't it true that at

some point you told [Berillo], it doesn't matter if you say that—if you told him that you did this, that you committed this crime. Do you remember saying that?" Defendant replied, "No, I don't remember saying that." The State then asked defendant, "you told him that it doesn't matter if you say you did it, it's whether or not he can prove that you did it. Do you recall saying that?" Defendant replied, "No."

¶ 121 The State indicated that it intended to call Berillo in rebuttal to perfect the impeachment. Defendant argued that the true context of the exchange concerned defendant's response to Berillo confronting him with the false claim that police found defendant's semen in the bathroom in the Belvidere house where K.T. alleged the Belvidere sexual assault occurred. Defendant noted that the trial court had previously precluded the parties from presenting evidence about defendant's admission to Berillo that he had masturbated in the bathroom.[2] First, defendant did not believe the State's questions were even impeaching because they asked whether he remembered making the statements during his interview with Berillo, not whether he made them. Next, defendant argued that the proposed impeachment was improper because it arose in the context of his masturbation admission, not whether he sexually assaulted K.T., and because the parties were barred from presenting evidence about the masturbation admission. The court rejected defendant's objection and allowed the State to recall Berillo to perfect the proposed impeachment.

¶ 122 Defendant then requested, pursuant to "the completeness doctrine," permission to ask Berillo whether defendant stated that "he doesn't think he should be arrested or go to prison, he

_____

[2]We note that the alleged masturbation admission was the subject of the State's successful appeal in the Boone County prosecution for the Belvidere incident. See *People v. Rowland*, 2025 IL App (4th) 241024-U (providing factual context for the masturbation admission). The parties represent that the underlying case, Boone County case No. 24-CF-80, remains pending.

didn't do anything." Defendant argued that "the completeness doctrine says that I can put in enough of the rest of the conversation to complete the context," and that the proposed additional statement from the interview would suffice to contextualize the State's proposed impeachment. The trial court denied defendant's request to question Berillo regarding the proposed completeness-doctrine statements.

¶ 123 Berillo was recalled. The State asked Berillo whether defendant stated, "It doesn't matter if he says he did it or not. If I can prove it, if I can prove he did it, prove that he did it, do my best." Berillo responded, "Yes." The State then requested leave to admit into evidence and publish to the jury the excerpt of the interview recorded by Berillo's body camera. The trial court granted leave over defendant's previous objection. In the excerpt, defendant stated, "It doesn't matter if they said they did it or not, whether you say you did it or not, it's got nothing to do with whether you did do it. If you can prove I did it, prove I did it. Do your best, and that's your job."

¶ 124 In his written posttrial motion, defendant challenged the use of the recorded excerpt of the interview between Berillo and defendant as impeachment. Defendant argued the excerpt presented created a false impression that defendant was challenging the State to prove him guilty, and he argued he should have been permitted to admit "other content of the same conversation under the completeness doctrine" to correct the perception that he had "challenged the government to prove him guilty." In the posttrial motion, defendant referred to Rule of Evidence 106, stating that Rule 106 "codified, in part" the common law completeness doctrine, but the written posttrial motion does not specifically invoke Rule 106 as a basis for the admission of the "other content of the same conversation." The written posttrial motion did not specifically identify precisely what "other content of the same conversation" defendant sought to admit under the completeness doctrine. During oral argument on the posttrial motion, defendant referred to his objection made at trial

regarding the statements he believed should have also been admitted: "At the time that we argued [the impeachment issue], I read directly from the paragraph that we were talking about" regarding the portion of the interview he wished to include under the completeness doctrine. The trial court rejected this argument and denied defendant's posttrial motion.

¶ 125   Defendant argues that the excerpt of the interview between Berillo and defendant created the impression that defendant was defying the government to prove his guilt of sexually abusing K.T. He argues that the trial court abused its discretion in refusing his request to include portions of the interview he believed would place the State's excerpt into proper context.

¶ 126   Preliminarily, we note that defendant challenges whether he was even subject to impeachment for the statements made to Berillo because the State framed the questions as whether defendant remembered making them instead of whether defendant made the statements. Generally, a witness may be impeached with his or her prior inconsistent statements. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 68. Whether a statement is consistent is considered in relation to the witness's trial testimony. *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 50. The witness's prior statement need not directly contradict the trial testimony; evasive answers, silences, changes in position, inability to recall, and omission of significant matters that are reasonably expected to be mentioned if true have all been deemed inconsistent with a witness's prior statements. *Id.* Here, defendant professed an inability to recall whether he made the statements to Berillo. This was adequately inconsistent to allow the State to prove up the impeachment by recalling Berillo to testify in rebuttal, and the trial court did not abuse its discretion in allowing the impeachment. *Id.*

¶ 127   Additionally, we note that defendant did not base any objection during the trial specifically on Rule of Evidence 106. Moreover, defendant remarked in his written posttrial motion that Rule

106 "codified in part" the common law completeness doctrine, but the written posttrial argument refers only to completeness doctrine without qualification or further citation to Rule 106. Under these circumstances, we hold that defendant has forfeited that portion of his argument based on Rule 106. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both a contemporaneous trial objection and a written posttrial motion are necessary to preserve errors for appeal). Conversely, defendant has preserved the issue under the common law completeness doctrine, having referred to it in his trial objection, and using it as the legal basis to support his claim in his written posttrial motion. Accordingly, we will address defendant's argument as it relates to the common law completeness doctrine.

¶ 128 Under the common law completeness doctrine, if one party introduces part of an utterance or writing, the opposing party is allowed to introduce either the entirety of the remainder or as much as necessary to prevent the jury from being misled. *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 66. The completeness doctrine applies to conversations, writings, and recordings. *Id.* Its purpose is to prevent the jury from being misled, to convey the true and correct meaning of a statement to the jury by placing the admitted portion into its proper context, and to further explain the meaning of already admitted evidence. *Id.* ¶ 67. The application of the completeness doctrine is left to the trial court's sound discretion, and evidence subject to admission under the completeness doctrine is limited to that which is relevant, material, and concerns the same subject at the same time. *Id.* However, the right to introduce the entirety of a statement is not absolute but depends on the relevancy of the additional parts of the statement the party wishes to introduce. *Id.*

¶ 129 Defendant argues that, because the context of the interview concerned whether he had masturbated in the bathroom, it was necessary under the completeness doctrine to allow him to

introduce the proposed statements, that he should not be arrested or go to prison and that he did nothing wrong, to properly contextualize the State's excerpt. The State argues that this contention should be deemed forfeited because defendant did not present to the trial court the precise statements he proposed, only a rather inarticulate synopsis, and he omitted any mention of them entirely from his written posttrial motion. We disagree. Defendant's synopsis was adequate to allow the trial court to consider defendant's request pursuant to the completeness doctrine, and his written posttrial motion refers specifically to the argument made in the trial court. This is adequate to preserve the contention for our consideration on appeal.

¶ 130 Defendant argues that, to effectively explain the context of the State's impeachment, he "needed to present the evidence he sought to introduce that K.T. had made provably false accusations of an incident that allegedly took place in Belvidere," and he wanted to let the jury know if the State's impeachment was a challenge to the government to prove his guilt, "it was with respect to the false Belvidere accusations." To supply this context, defendant proposed that he be allowed to introduce a portion of the same interview in which he told Berillo that, "he doesn't think he should be arrested or go to prison, he didn't do anything." The touchstone of the completeness doctrine is relevance. *Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 67. The proposed statements are unrelated to the purpose for which defendant contends they are needed— to show that he is complaining about a false accusation, not the current prosecution. As we have discussed above, the exclusion of the claimed false accusation evidence was not error, and the proposed completeness doctrine statements do not indicate that defendant is challenging a false accusation. Rather, considering defendant's trial testimony, the statements are simply prior consistent statements echoing his trial testimony denying that he sexually abused K.T. Thus, instead of curing any tendency to mislead the jury with the State's excerpted statements,

defendant's proposed statements would further mislead the jury, inject defendant's prior consistent statements into the mix, and stand as a profession of innocence that could not be cross-examined. These are all improper purposes under the completeness doctrine, and we reject defendant's argument on this basis. *Id.*

¶ 131   Further, defendant's larger argument that he was not allowed to present evidence of the entirety of the charges, accusations, and investigations across the McHenry County and Boone County jurisdictions, and that he was handcuffed in his ability to rebut the false impression that he was taunting the police and their ability to prove any wrongdoing has been addressed above. The trial court indicated its willingness to allow defendant to more fully flesh out the context of the conversation by allowing defendant to bring in the discussion of his admission that he masturbated in the bathroom in the Belvidere home, but defendant declined the invitation and sought only to introduce his claims that he did not do anything, he should not be arrested and he should not be punished. Nothing in defendant's completeness doctrine statements indicate that the State's characterization of the interview at that point as pertaining to the broader issue of whether he sexually abused K.T. as charged in this case was somehow wrong. Accordingly, we hold that the trial court did not abuse its discretion in denying defendant's request to add the additional excerpt of the interview between Berillo and defendant pursuant to the completeness doctrine.

¶ 132                               F. Improper Jury Communication

¶ 133   Defendant contends that the bailiff's questioning of the jury regarding their family obligations that Halloween night, constitutes improper and prejudicial *ex parte* judicial communication with a deliberating jury. Communication between a judge or a third party and a deliberating jury without the participation of the defendant deprives the defendant of his constitutional rights to participate in the proceedings; however, where it is apparent that no harm

or prejudice resulted from such a communication, the verdict will not be set aside. *People v. Kliner*, 185 Ill. 2d 81, 162 (1998); *People v. Rettig*, 50 Ill. 2d 317, 319 (1972). The burden remains with the State to prove beyond a reasonable doubt that any error accruing from the communication was harmless. *Kliner*, 185 Ill. 2d at 162.

¶ 134 The record shows that the jury began its deliberations on Halloween, October 31, 2024. Sometime before 4 p.m., the trial court asked the bailiff to ask the jurors about any sort of family obligation they may have had regarding Halloween observances. The bailiff reported back to the court that he had a general sense that the jurors did not want to deliberate so long that they would miss all the scheduled hours for trick-or-treating. The court convened the parties and asked them their thoughts on ending the deliberations for the day and returning the next morning. The State objected. Defendant agreed with the State's objection, adding that, if the jury was working, they should not be interrupted, but that the court and parties could revisit the issue if the jury sent a note to the judge. The court then revealed it already had the bailiff inquire about the jurors' family obligations and related that the jury did not wish to miss all of the trick-or-treating that evening, but the jury had not yet requested to cease its deliberations. Defendant did not object at that point to the revelation that the bailiff had made any inquiry to the jury about its preferences. The court then proposed that the bailiff tell the jury to keep deliberating, and the parties agreed. Although it is not clear in the record, defendant asserted in his posttrial motion that, 20-30 minutes after the discussion between the court and the parties, the jury indicated it had reached a verdict.

¶ 135 The State argues that, by not objecting when he had the opportunity, defendant has forfeited for our review any error in the bailiff's communication. We agree. A defendant must object to an improper jury communication to allow the trial court an opportunity to correct the error. *People v. Kimble*, 2019 IL 122830, ¶ 44. The failure to object to an improper jury communication is subject

to the familiar principles set forth in *Enoch*, contemporaneous trial objection and raising the issue in a written posttrial motion. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). Because defendant here did not object once the trial court informed the parties of the bailiff's contact with the jury outside of defendant's presence or participation, he has forfeited the issue. *Id.* Moreover, after the revelation, defendant agreed with the court's plan to tell the jurors to keep deliberating. We note that defendant did file a posttrial motion addressing this issue and asserts in his reply brief that he "objected at trial to the Court's intrusion [into jury deliberations] (albeit after the fact)." The record reveals that defendant did not object when the court announced that it had the bailiff inquire about the jury's plans for the evening and did not object after the jury returned its verdict when the court invited the parties to raise any further issues necessary. Instead, defendant's "after the fact" objection was first raised on March 20, 2025, during argument on his posttrial motion. Nearly five months after the fact does not constitute a contemporaneous objection.

¶ 136 Forfeiture aside, it is well established that a nonprejudicial *ex parte* communication does not impact the fairness of a defendant's trial. *Kimble*, 2019 IL 122830, ¶ 44. Here, the trial court, employing the bailiff, made a preliminary inquiry to ascertain the jurors' Halloween commitments and then sought input from the parties. While it would have been better for the court to bring in the parties first to apprise them of its plan, the court's action amounted to scheduling. Indeed, the court noted that the jurors had all committed to being able to serve on the jury through the next day, and interrupting deliberations on Halloween to return the next morning was always a possibility. When the court consulted with the parties, they took the position it was better to let sleeping dogs lie and wait until the jury sent a note. The court also secured the parties' agreement to have the bailiff tell the jury to keep deliberating. Accordingly, we perceive neither error nor prejudice accruing from the court's initial *ex parte* contact with the jury.

¶ 137 Defendant argues that the bailiff's inquiry instilled in the jury the hope that they would be released to attend to their Halloween observances. When the bailiff returned to tell the jury it was to keep deliberating, that hope was dashed, and a brief 20 minutes later, the jury returned its verdicts. This argument overlooks that defendant did not object to the court's decision, after consultation with both defendant and the State, to instruct the jury to keep deliberating. First, such an instruction has been deemed proper and noncoercive. *Id.* Importantly, the jury had given no sign of deadlock or difficulties in comprehending any of the legal instructions or in completing its deliberations. The jury had deliberated for about four hours in a case in which the evidence was neither particularly voluminous nor complex. There is no indication that, had the jury not been disturbed, the verdict would not have been returned at the same time. Moreover, it was still only around 4 p.m.—well before the normal close of a business day. The court's demonstrated solicitousness regarding the jurors' possible family obligations clearly should have indicated it would have been open to revisiting the issue should the deliberations have continued much longer. Finally, by not objecting, defendant prevented the court from even determining whether the jurors were feeling pressure to wrap it up so they would not miss Halloween with their families and friends, let alone handling, ameliorating, or otherwise curing any error resulting from the initial *ex parte* contact.

¶ 138 Defendant also urges that we consider this issue as plain error. The plain error doctrine allows a reviewing court to consider an unpreserved error under limited circumstances. *People v. Birge*, 2021 IL 125644, ¶ 24. Before a reviewing court can apply the plain error doctrine, however, there must first have been a clear or obvious error in the trial court proceedings. *Id.* Here, as discussed above, there was no error. The trial court engaged in what amounted to a scheduling

inquiry. Because there was no clear or obvious error, we cannot consider the issue as plain error.

*Id.*

¶ 139 Therefore, we conclude that defendant has forfeited this contention and, in any event, agreed to the procedure the court ultimately adopted. Further we discern no prejudice accruing to defendant resulting from what was effectively a scheduling inquiry.

¶ 140                                III. CONCLUSION

¶ 141 For the foregoing reasons, we affirm judgment of the circuit court McHenry County.

¶ 142 Affirmed.